**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | | |
|---|---|---|
| **GENARO QUILES-QUILES,** | * | |
| | * | **CIVIL NO.** |
| **Plaintiff,** | * | |
| | * | **RE: TORTS** |
| v. | * | |
| | * | |
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Defendant.** | * | |

*****************************************

# COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** the plaintiff, by and through the undersigned counsel, and respectfully alleges, states and requests, as follows:

## I. <u>Nature of the Action</u>

1.1    **Genaro Quiles-Quiles** (**"Quiles"** or "Plaintiff") brings this action against the **United States of America** (**"USA"** or "Defendant") seeking compensatory damages, pursuant to the Federal Tort Claim Act ("FTCA").

1.2    **Quiles** claims hereunder that agents and employees of the **United States Department of Veterans Affairs** (the **"VA"**), acting within the scope of their employment, intentionally and/or negligently, inflicted upon him emotional distress and subjected him to undue intrusions into his private life, in violation of his constitutional rights to privacy, dignity, family and honor, under Sections 1 and 8 of Article II of the Puerto Rico Constitution.

1.3    **Quiles** further claims hereunder that agents and employees of the **VA**, acting within the scope of their employment, intentionally restricted his liberty and illegally detained him.

## II.  Jurisdiction and Venue

2.1    This Honorable Court has subject matter jurisdiction to allow this suit pursuant to 28 U.S.C. §§ 1331 and 1346(b) and 39 U.S.C. § 409(c).

2.2    This action is authorized pursuant to the FTCA, 28 U.S.C. §§ 2671-2680, and Articles 1802 and 1803 of the Civil Code of the Commonwealth of Puerto Rico, 31 L.P.R.A. ¶¶ 5141 and 5142, as provided by 28 U.S.C. § 1367.

2.3    This Honorable Court has personal jurisdiction over this civil action because the acts alleged to be unlawful were committed and the damages were suffered by the plaintiff within the jurisdiction of the United States District Court, District of Puerto Rico.

2.4    Venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. §3732(a) because Defendant does business in Puerto Rico and the acts forming the basis of this Complaint caused Plaintiff to sustain his damages within the District of Puerto Rico.

## III.  Exhaustion of Administrative Remedies

3.1    On September 5, 2018, **Quiles** timely filed an administrative claim in torts with the Claims Department of the **VA**.

3.2    On January 3, 2018, the **VA** denied **Quiles'** administrative tort claim.

## IV.  **The Parties**

4.1    **Quiles** is a veteran who was honorably discharged and was later found by the **VA** to suffer from mental and physical disabilities related to the services he rendered to the U.S.A. Army.

4.2    At all times relevant herein, **USA** was legally responsible for the negligent acts and/or omissions of the **VA's** agents and employees, acting within the scope of their employment with the **VA**.

## IV.  **Factual Allegations**

**A.    The VA's Intentional or Negligent Infliction of Emotional Distress Upon Quiles for Being Identified as a Witness in a Fellow Veteran's Grievances against the VA.**

4.1    On August 5, 2016, **Quiles** accompanied WWII combatant veteran **Jose A. Cruz** ("**Cruz**") to the **VA's** Station ID 355 of the San Juan Regional Benefit Office (henceforth the "SJ Office") to inquire about the status of a claim for service-connected disability benefits that had been lodged by **Cruz**.

4.2    While in Station ID 355 of the SJ Office, **Cruz** was victim of hostile and abusive behavior by **VA** personnel, in the presence **Quiles**. This incident caused both of them to experience severe anxiety and distress.

4.3    On August 25, 2016, **Cruz** executed a Sworn Statement in support of VA Form 21-0845, authorizing the disclosure of his personal information to **Quiles**. **Cruz'** sworn statement clearly described the relationship he had with and the assistance he needed from **Quiles** regarding veteran matters (when his daughters were unavailable).

3

4.4     On September 4, 2016, **Cruz** sent a letter complaining about the incident of August 5, 2016, to then President **Barak Obama** and Congressman **Jeff Miller**, copying the SJ Office. **Cruz** claim therein that he had been subjected to retaliatory hostility and breach of the peace due to his pending claim against **VA** officials working out of Station ID 355, such as, **Ms. Wendy L. Torres** (Director), **S.A. Jackson** (Acting Director) and **Mr. Alfredo Zabala, Jr.** (Service Manager). This letter identified **Quiles** as a witness for **Cruz** and was co-signed by **Quiles**.

4.5     On October 18, 2016, **Cruz** sent a letter to **Ms. Linda A. Halliday** (Deputy Inspector General), wherein he complained of retaliatory harassment, breach of the peace and other discriminatory acts committed by **VA** agents and employees against him. This letter also included **Quiles'** signature and identified him as a witness for **Cruz**.

4.6     On November 2, 2016, **Quiles**, on behalf of **Cruz**, wrote to the **VA's** Office of Resolution Management (the "ORM"), complaining about the top **VA** officials' retaliatory harassment and other unlawful discriminatory practices; and, requesting the prompt adjudication of **Cruz's** claims.

4.7     On December 21, 2016, **Cruz** submitted a Civil Rights Complaint and a separate discrimination grievance to the ORM, where **Quiles**, anew, appeared as witness and co-signer.

4

4.8     Lastly, on April 17, 2017, **Cruz** sent another letter to **Mr. David Shulkin** (Secretary of Veterans Affairs) and the ORM regarding these matters, where **Quiles** also appeared as a witness and co-signer.

4.9     After September 4, 2016 (when **Cruz** complained about the August 5 incident), whenever **Quiles** visited the SJ Office, either accompanying **Cruz** or with his wife, **Ms. Aurea R. García-Santiago** ("**Garcia**"), or by himself, he was subjected to retaliatory acts by the SJ Office's agents and employees by reason of having been identified as a witness for **Cruz** in connection with his complaints of harassment, retaliation and discrimination.

**B.     The VA's Intentional or Negligent Infliction of Emotional Distress upon Quiles Due to Medical Mistreatment by the VA Caribbean Healthcare System.**

4.10    On January 22, 2018, **Quiles**, accompanied by his wife **Garcia**, went to the office of psychiatrist **Carmen Rodríguez** ("**Dr. Rodriguez**"), at the **VA** Caribbean Healthcare System (the "CHS") for a Compensation and Pension examination.

4.11    **Quiles** furnished to **Dr. Rodriguez** VA Form 21-2680 (Examination for Housebound Status or Permanent Need for Regular Aid and Attendance) and several Medical Reports prepared by his neurologist, **Dr. Heriberto A. Acosta** ("**Dr. Acosta**"), as well as a recent Psychiatric Report rendered by his treating psychiatrist, **Dr. Fernando J. Cabrera** ("**Dr. Cabrera**").

4.12   After answering some preliminary questions, without any apparent reason, **Dr. Rodriguez** began addressing **Quiles** in a high tone of voice, stating: "you all are the same, I ask you to tell me about your depression symptoms and you all start talking about your families."

4.13   When **Quiles** tried to answer **Dr. Rodriguez's** questions regarding his symptoms, the psychiatrist got more irritated, interrupted him and, in a deliberately harsh tone of voice, told him: "I could stop this evaluation right now and ask another **VA** psychiatrist to perform it."

4.14   Despite **Dr. Rodriguez's** hostile behavior, **Quiles** informed her that he had only gone there to submit VA Form 21-2680, together with his Medical and Psychiatric Reports (as suggested by his Disabled American Veterans representatives).

4.15   Notwithstanding, after **Quiles** handed these medical records and forms to **Dr. Rodriguez**, she proceeded to shame, humiliate and disrespect him by abruptly throwing all of them onto the top corner of her desk without looking at them.

4.16   As **Dr. Rodriguez** mishandled **Quiles'** medical documentation, she told him -- again, in a high tone of voice and displaying menacing demeanor -- that: "The diagnosis of **Dr. Cabrera** and **Dr. Acosta** are erroneous because you mislead them by talking too much, if you like you could look me up on the Web, I am also board certified. I could opine also."

4.17   **Dr. Rodriguez's** misbehavior caused **Quiles** to suffer extreme shame, embarrassment, humiliation, nervousness, anxiety and

anger in her office, which symptoms caused him to experience an exacerbation of his service-connected mental conditions.

4.18 **Quiles** left **Dr. Rodriguez'** office and immediately went to his treating psychiatrist, who provided him emergency psychotherapy and adjusted his medications to stabilize him.

**C.    The VA's Intentional or Negligent Infliction of Emotional Distress upon Quiles Due to Interactions with VA Officials and Employees and its illegal detention of Quiles.**

4.19 On May 29, 2018, **Quiles** and his wife **Garcia** went to the SJ Office for the purpose of obtaining records of all of his granted service-connected disabilities, conditions, percentages of disability and diagnostic codes.

4.20 The reason for **Quiles'** inquiry into his service-connected status was due to the SJ Office's failure to provide him with medical benefits pertaining to his heart condition, including mild left-ventricular-hypertrophy heart disease and hypertensive cardiovascular disease, as granted by the Board of Veterans Appeals (the "BVA") on November 29, 2017.

4.21 After a while of waiting for the record requested in the outer waiting area of the SJ Office, the **VA** employee on duty handed **Quiles** a letter that was flawed and incomplete because it did not contain all of the information needed to proceed to claim his benefits; particularly, the information regarding his disability percentages and diagnostic codes related to his service-connected disability accepted in his appeal was missing.

4.22   The **VA** employee then instructed **Quiles** to fill out a form that would allow him to speak with **VA** personnel about the foregoing omissions in the document delivered to him. Plaintiff filled out this form, attached thereto the original Opinion of the BVA and returned it to the **VA** employee.

4.23   Shortly thereafter, **Quiles** vainly tried to explain to **VA** personnel the inconsistencies between the findings of his disability status in the BVA's Opinion and the document he had just been furnished.

4.24   Ultimately, **Quiles** was referred to two **VA** officials, **Ms. Melody Thompson** ("**Thompson**") and **Mr. William García** ("**Garcia**"), to discuss this matter.

4.25   Upon entering **Thompson's** office, **Quiles** sat down on a chair in front of her desk. **Thompson** then began working on her computer. **Quiles** put his cellphone on vibration mode. Unexpectedly, **Thompson** reacted to this by telling **Quiles** that she could not proceed any further unless he handed over his cell phone to her because, according to her, she had to see if he was recording or filming their meeting. Plaintiff refused to do so, on privacy grounds.

4.26   **Thompson** then apathetically left her office to consult with her supervisor **Garcia**, whose office was across from hers. **Quiles** was left alone in her office; and, through the office door window, two unidentified

males kept watch over him the entire time **Thompson** consulted with **Garcia**.

4.27 At this point, **Quiles** began to experience overwhelming feelings of uncertainty, confusion and anxiety because of what was happening. He began breathing heavily and his heart was palpitating. He had a sensation of abandonment and felt he was being accused and singled out for no reason. Plaintiff then began experiencing flashbacks of being detained totally against his will; much like the inmates he had looked after when he previously worked as a correctional officer at the Rio Piedras State Penitentiary, in Puerto Rico. These symptoms led Plaintiff to feel that he was unraveling mentally and becoming emotionally unstable.

4.28 Shortly thereafter, both **Garcia** and **Thompson** entered the office to speak with **Quiles**. Notwithstanding his fragile emotional condition, **Quiles** was able to remain respectful and maintain a low tone of voice while he explained to them that he did not wish to consent to handing over his personal property.

4.29 **Garcia** then told **Quiles**: "For many years I've been on the team of **VA** decision makers here in San Juan. I honestly suggest you change your psychiatrist, because **Dr. Cabrera** is not helping you at all." Plaintiff was shocked and traumatized by these comments.

4.30 At this point, **Thompson** intervened in the exchange between **Garcia** and **Quiles**, telling **Garcia**, "Boss, no, no, no, that's illegal. We're not supposed to tell the veteran which doctor he or she

should choose." **Garcia** then turned to **Thompson** and ordered her to call security. **Quiles** was not allowed to leave the office.

4.31 When **Quiles** heard the order to call security, he felt apprehensive and dejected. He suspected that he would be charged with some unfounded crime; all the while thinking about his frail wife who was waiting for him in the reception area outside the office.

4.32 **Quiles** was detained and left alone in the office against his will until security personnel arrived about two and a half hours later accompanied by **Thompson**.

4.33 **Thompson** and a young security officer entered the office where **Quiles** remained seated and illegally detained. The officer stood by the door staring at Plaintiff with a scowl and without uttering a word; a while later, the officer left the room closing the door behind him.

4.34 **Quiles** felt humiliated and worthless. He kept thinking of his wife who was still in the waiting room and also battling with her own delicate medical condition. Wanting only to be as far away from his abusers as possible, for his and his wife's sake, **Quiles** succumbed to their request and turned over his cell phone and everything else that was asked of him to the **VA** personnel.

4.35 That same day (May 29), **Thompson** and **Garcia** told **Quiles** that his benefits would not be provided because the Disabled American Veterans (the "DAV") office did not give them the full details regarding the disability percentages and the diagnostic codes necessary to do so. For

such reason, the DAV did not provide to **Quiles** the medical treatment which the BV had found he was entitled to since November 29, 2017.

## V.  <u>CAUSES OF ACTION</u>

### First Cause of Action -- Intentional or Negligent Infliction of Emotional Distress

5.1    The paragraphs stated hereinbefore are literally incorporated herein and are made part of this paragraph.

5.2    **USA**, through its **VA** agents and employees, intentionally and/or negligently, caused **Quiles** to be subjected to intentional infliction of emotional distress, invasion of privacy and other extreme and outrageous conduct.

5.3    As a direct result of **USA's** fault and/or negligence, **Quiles** sustained an aggravation of a previous mental condition; has suffered and will continue to suffer severe moral and emotional pain, anguish and distress; and, has sustained a loss of happiness and a loss of the capacity to enjoy life.


**THEREFORE, Quiles** demands that Judgment be entered in his favor and against the **USA**, awarding him compensatory damages, reasonable attorney's fees, the costs of this action and post-judgment interests; and, granting him such other further relief that under the circumstances may seem appropriate to this Honorable Court.

### Second Cause of Action -- Illegal Detention

5.4    The paragraphs stated hereinbefore are literally incorporated

herein and are made part of this paragraph.

5.5   **USA**, through its **VA** agents and employees, intentionally restricted **Qulies'** freedom and deprived him of his liberty, against his will.

5.6   As a direct result of the **USA's** fault and/or negligence, **Quiles** sustained an aggravation of a previous mental condition; has suffered and will continue to suffer severe moral and emotional pain, anguish and distress; and, has sustained a loss of happiness and a loss of the capacity to enjoy life.

**THEREFORE, Quiles** demands that Judgment be entered in his favor and against the **USA**, awarding him compensatory damages, reasonable attorney's fees, the costs of this action and post-judgment interests; and, granting him such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## VI. <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** it is respectfully requested that Judgment be entered by this Honorable Court in favor of Plaintiff and against Defendant:

a.   granting Plaintiff compensatory damages in an amount no less than **ONE MILLION DOLLARS ($1,000,000)**;

b.   imposing upon Defendant the payment of all costs and expenses to be incurred in this lawsuit;

c.      awarding Plaintiff a reasonable amount for attorney's fees; and,

d.      granting Plaintiff any other relief that he may be entitled to as a matter of law.

**RESPECTFULLY SUBMITTED.** In San Juan, Puerto Rico, this 5th day of March, 2019.

*/s/José F. Quetglas Jordán*
        USDC-PR #203411

**QUETGLAS LAW FIRM, P.S.C.**
1353, Luis Vigoreaux Ave.
PMB 657
Guaynabo, PR 00966
Tel: (787) 406-8915
Email: jfquetglas@gmail.com;
quetglaslawpsc@gmail.com