**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

GENARO QUILES QUILES,

    Plaintiff,

        v.                      CIVIL NO.: 19-1207 (MEL)

UNITED STATES OF AMERICA,

    Defendant.

**MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

## I. PROCEDURAL HISTORY

On March 11, 2019, Genaro Quiles Quiles ("Plaintiff") filed a complaint against the United States of America arising from actions by agents and employees of the United States Department of Veterans Affairs (the "VA") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1). ECF No. 4. Plaintiff alleged he was subject to intentional, and in the alternative, negligent infliction of emotional distress by VA agents and employees on three separate occasions, in violation of article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141 (imposing liability for damages caused by fault or negligence).[1] ECF No. 4 at 3, 5, 7. Plaintiff additionally claimed that during the third incident in question he was subject to illegal detention and suffered the violation of his rights to privacy, dignity, family, and honor under Sections 1 and 8 of Article II of the Puerto Rico Constitution. ECF No. 4 at 1. Plaintiff also originally alleged he was the victim of retaliatory conduct by VA agents and employees. ECF No. 4 at 3–5.

---

[1] A new Civil Code of Puerto Rico became effective on November 28, 2020. Article 1802 is now Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5311. Even so, because the events at issue in this case occurred before the new Civil Code became effective, the applicable provisions are the prior version of the Civil Code.

On November 13, 2019, the court issued a deadline of February 28, 2020 to file motions to dismiss. ECF No. 18. In response to a joint motion by the parties to amend the case schedule (ECF No. 22), the court set the deadline to January 30, 2020 to file motions for summary judgment. ECF No. 23 (referencing ECF No. 22 at 3). On April 6, 2021, Defendant filed a motion for extension of time to file a "dispositive motion." ECF No. 28. However, because the deadline to file both motions to dismiss and motions for summary judgment had expired more than a year before, the court denied Defendant's motion as untimely. ECF No. 30.

A bench trial was held on all of Plaintiff's claims from October 18 to October 20, 2021. ECF Nos. 52, 53, 54. At the close of Plaintiff's case on October 19, Defense counsel moved for judgment pursuant to Federal Rule of Civil Procedure 52(c), and oral argument was heard from both sides. Trial, Oct. 19, at 4:28–5:48 PM. During oral argument for the Rule 52(c) motion, Plaintiff expressly dropped the retaliation claim against the United States. Trial, Oct. 19, at 4:54 PM. Pending before the court is Defendant's Rule 52(c) motion regarding Plaintiff's remaining claims. The court will first address the parties' Rule 52(c) arguments before turning to the merits on the remaining claims presented at trial.

## II.    FINDINGS OF FACT

Plaintiff Genaro Quiles Quiles is a sixty-year-old veteran and resident of Puerto Rico. Trial, Oct. 18, at 9:21 AM. Plaintiff served in the United States Army from 1979 to 1982 in heavy field artillery and in the Army Reserves until 1987. Trial, Oct. 18, at 9:24 AM. Following his honorable discharge from the Army, Plaintiff worked as a correctional officer at the Río Piedras State Penitentiary and as a United States Postal Service employee until he retired due to disabilities. Trial, Oct. 18, at 9:25–9:26 AM. Plaintiff suffers from several service-related disabilities recognized by the VA including major depression, heart disability, tinnitus, cancer of

the nose, erectile disfunction, and disability resulting from an operation on his left testicle. Trial, Oct. 18, at 9:30–9:31 AM. He has further pending claims at the VA for Alzheimer's disease, memory loss, and post-traumatic stress disorder. Trial, Oct. 18, at 9:31–9:32 AM.

Plaintiff's claims arise from three, unrelated incidents involving employees of the VA. The first occurred at the VA Hospital in San Juan, Puerto Rico on August 5, 2016. Trial, Oct. 18, at 9:46 AM. On that date, Plaintiff was accompanying his close friend, Mr. José Cruz, an eighty-nine-year-old World War II veteran, to the VA Hospital. Trial, Oct. 18, at 9:39 AM; 9:46 AM. Mr. Cruz did not have an appointment but had been told by his Veterans of Foreign Wars representative that he could come any Friday to his representative's office without an appointment. Trial, Oct. 18, at 9:49 AM.

Upon arriving, Plaintiff explained to VA employee Juan Viches ("Mr. Viches") why Mr. Cruz had come to the hospital, and Mr. Viches told Plaintiff and Mr. Cruz to be seated in the waiting area. Trial, Oct. 18, at 9:49 AM; 9:54 AM. While waiting, Plaintiff accompanied Mr. Cruz to the restroom. Trial, Oct. 18, at 9:49–9:50 AM. Upon returning, Mr. Viches rudely confronted Mr. Cruz and told him that his name had been called while he was in the restroom. Trial, Oct. 18, at 9:50 AM. He chastised Mr. Cruz in a high tone of voice while waving his hands, saying "Listen, you had intention to see your representative and when your representative was available you were not in the area." Trial, Oct. 18, at 9:50 AM.

Plaintiff took offense at the disrespectful conduct of Mr. Viches toward his friend Mr. Cruz. Trial, Oct. 18, at 9:51–9:52 AM. Plaintiff confronted Mr. Viches, asked for Mr. Viches' name, and complained to the service director of the VA hospital. Trial, Oct. 18, at 9:51–9:52 AM. Finally, the Veterans of Foreign Wars representative collected Mr. Cruz and provided him the required services before escorting Mr. Cruz and Plaintiff out of the hospital.

Trial, Oct. 18, at 9:53–9:54 AM. Plaintiff claims that through this interaction with Mr. Viches, the VA either intentionally or negligently caused him emotional distress in violation of Puerto Rico Civil Code § 1802, and under common law intentional infliction of emotional distress. ECF No. 4 at 3; ECF No. 25 at 19; Trial, Oct. 19, at 5:00–5:02 PM.

The second incident occurred on January 22, 2018, when Plaintiff went to the VA Hospital in San Juan for a compensation and pension exam with VA psychiatrist Dr. Carmen Rodríguez. Trial, Oct. 18, at 9:54–9:55 AM. Dr. Rodríguez was to conduct an exam to determine Plaintiff's eligibility for "aid and attendance" benefits. Trial, Oct. 18, at 2:37 PM. Plaintiff perceived most of Dr. Rodríguez's statements and questions as slights, insults, and threats. However, he admitted at trial that he was "mentally and emotionally unstable" during Dr. Rodríguez's examination. Trial, Oct. 19, at 11:24 AM.

When Plaintiff arrived at Dr. Rodríguez's office, she asked Plaintiff to describe his depression symptoms. Trial, Oct. 18, at 9:56 AM. Plaintiff began to describe how stress induced him to forget the names of his two grandsons. Trial, Oct. 18, at 9:56–9:57 AM. However, Dr. Rodríguez cut him off and said, in a high tone of voice, "All you are the same. I asked you to tell me your depression symptoms and you commenced talking about your family." Trial, Oct. 18, at 9:57 AM. After being interrupted, Plaintiff handed Dr. Rodríguez documents that included medical reports by his treating psychiatrist and private neurologist. Trial, Oct. 18, at 9:58 AM. At some point after accepting the documents, Dr. Rodríguez tossed the documents into the corner of her desk, an act that Plaintiff felt was disrespectful and made him feel "angry," "nervous," and "upset." Trial, Oct. 18, at 9:58–9:59 AM.

Dr. Rodríguez then told Plaintiff that she did not believe his private physicians' diagnoses were correct. Trial, Oct. 18, at 9:59–10:00 AM. Plaintiff therefore became upset and told

Dr. Rodríguez that her conduct was unethical in refuting the opinion of another psychiatrist. Trial, Oct. 18, at 10:00 AM. Dr. Rodríguez defended her credentials and offered Plaintiff the option of conducting the benefits and compensation exam with another psychiatrist. Trial, Oct. 18, at 10:00–10:01 AM. Plaintiff refused to conduct the exam with another psychiatrist because for some reason he felt the offer was a threat. Trial, Oct. 18, at 10:01 AM. Plaintiff finished the examination with Dr. Rodríguez, and as he was leaving, Dr. Rodríguez told Plaintiff to give his treating psychiatrist "her regards." Trial, Oct. 18, at 10:01 AM. Once again, Plaintiff felt offended, perceiving this comment as a "gesture of sarcasm" and "insulting." Trial, Oct. 19, at 11:24 AM. Dr. Rodríguez later prepared a report of her examination of Plaintiff which included the medical reports of Plaintiff's private physicians. Joint Exhibit XII, at 42–43.[2] Plaintiff claims that during the January 22, 2018 examination, Dr. Rodríguez intentionally or negligently caused him emotional distress in violation of Puerto Rico Civil Code § 1802, and under common law intentional infliction of emotional distress. ECF No. 4 at 5; ECF No. 25 at 19; Trial, Oct. 19, at 5:00–5:02 PM.

The final incident occurred on May 29, 2018 at the VA Benefits and Compensation Section in Guaynabo, Puerto Rico. Plaintiff arrived at the VA Benefits and Compensation Section seeking to obtain a letter detailing all his service-connected disabilities. Trial, Oct. 18, at 10:11 AM. When Plaintiff was delivered an unsatisfactory letter by VA employees, he explained that the letter was missing information. Trial, Oct. 18, at 10:23–10:24 AM. Subsequently, Plaintiff was collected by VA employee Ms. Melody Thompson and taken to interview room 126 to be served. Trial, Oct. 18, at 10:25–10:26 AM; Trial, Oct. 18, at 9:26 AM. The interview rooms

---

[2] The trial exhibits referenced in this Memorandum, Findings of Fact, Conclusions of Law, and Order have been docketed as ECF No. 56.

were located on the first floor and could be accessed from the lobby and exited via a set of

double doors at the far end of the hallway. Exhibits VI, VIII.

On that date, the VA Benefits and Compensation Section had signs posted throughout the

facility detailing that the VA regulations did not permit the taking of photos, video, or audio

inside the facility with personal equipment such as cell phones.[3] Trial, Oct. 20, at 9:159:23 AM;

11:28 AM; 11:36–11:38 AM; 11:43 AM; Joint Exhibit V, VII. It can be reasonably inferred that

Plaintiff was on notice of this policy as he passed the signs posted at the entrance of the facility,

in the lobby, and outside the door to interview room 126. Trial, Oct. 20, at 11:28 AM; 11:36–

11:38 AM; 11:43 AM; Joint Exhibit V, VII.[4] At the beginning of his interview with

Ms. Thompson, Plaintiff withdrew his phone from his case so that he could put the phone on

vibrate mode. Trial, Oct. 18, at 10:35 AM. Meanwhile, Ms. Thompson saw what she believed to

be the camera app open and recording on Plaintiff's phone, in violation of the posted policy.

Trial, Oct. 20, at 9:33 AM. Ms. Thompson notified Plaintiff that she thought his phone might be

recording, which Plaintiff denied. Trial, Oct. 20, at 9:33 AM. Plaintiff then refused

Ms. Thompson's requests that he ensure that his phone was not recording or to turn off his cell

phone. Trial, Oct. 20, at 9:34 AM. Ms. Thompson advised Plaintiff that she did not feel

comfortable being recorded and needed to fetch a supervisor, as was the protocol. Trial, Oct. 20,

at 9:36 AM.

Ms. Thompson left Plaintiff alone in interview room 126 for a few minutes while she

fetched her supervisor Mr. William García, and they both returned to the interview room. Trial,

---

[3] The sign posted at the entrance to the facility (Joint Exhibit III) does not convey an identical message as the signs
in the rest of the facility. A correction was grafted onto the original notice which covers part of the text, thereby
convoluting the language and obscuring its clear meaning and scope. Nevertheless, the other signs throughout the
facility convey a clear message that recording audio, video, or taking photos inside the facility is prohibited. See e.g.
Joint Exhibits V, VII.
[4] Although the photographs in certain exhibits do not make the signs legible (e.g. Joint Exhibits IV, IX, X), their
overall appearance is strikingly similar to those that are legible (Joint Exhibits V, VII).

Oct. 20, at 9:37 AM; 11:48 AM. Upon arriving, Mr. García introduced himself and explained to Plaintiff the posted VA policy concerning cell phones and asked Plaintiff to turn off his cell phone. Trial, Oct. 19, at 12:10 PM. Plaintiff refused to turn off his cell phone and became agitated and loud, hitting the table with his fists. Trial, Oct. 20, at 9:40 AM; 11:56–11:57 AM. In response, Mr. García asked Ms. Thompson to get the assistance of a security guard. Trial, Oct. 20, at 9:40 AM; 11:56–11:57 AM. When the security guard arrived, Plaintiff calmed down, apologized, and agreed to turn off his cell phone. Trial, Oct. 20, at 9:45 AM; 12:02–12:03 PM. Plaintiff also offered to surrender his cell phone to Mr. García, but Mr. García refused to take it, explaining that he did not need to confiscate the phone, he only needed to know it was turned off. Trial, Oct. 20, at 11:53–11:54 AM. At no point did Plaintiff lose possession of his phone during the May 29, 2018 incident, nor did any VA employee demand that Plaintiff surrender his phone or search his phone. Trial, Oct. 20, at 9:44; 11:53–11:54 AM.

After Plaintiff agreed to turn off his phone and put it in his pocket, Mr. García completed the service interview with Plaintiff and Plaintiff left the VA Benefits and Compensation Section. Trial, Oct. 20, at 9:44 AM; 9:47 AM; 12:03 PM. The entire incident on May 29, 2018 occurred in the span of one hour, or slightly longer. See Trial, Oct. 20, at 10:20 AM; 12:23 PM. Plaintiff claims that during the May 29, 2018 incident, VA employees Ms. Thompson and Mr. García intentionally or negligently caused him emotional distress in violation of Puerto Rico Civil Code § 1802, subjected him to false imprisonment, and violated his privacy rights. ECF No. 4 at 1, ¶¶ 1.2, 5.2; 7, 11, ¶¶ 5.4–5.6; ECF No. 25 at 19; Trial, Oct. 19, at 5:00–5:02 PM.

## III.   ANALYSIS

Plaintiff brings his claims pursuant to the Federal Tort Claims Act ("FTCA"). The FTCA grants federal district courts jurisdiction over claims:

> for injury or loss of property, or personal injury or death caused by the negligent
> or wrongful act or omission of any employee of the Government while acting
> within the scope of his office or employment, under circumstances where the
> United States, if a private person, would be liable to the claimant in accordance
> with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Under the FTCA, "the law of the place where the act or omission

occurred" requires that the substantive law of the state where the injury occurred governs.

Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir. 2009). For the purposes of the FTCA,

Puerto Rico is treated as a state, and its law applies. Id. The FTCA also requires a plaintiff to

exhaust administrative remedies with the appropriate federal agency before filing suit. 28 U.S.C.

§ 2675 ("An action shall not be instituted . . . against the United States for money damages or

loss of property . . . unless the claimant shall have first presented the claim to the appropriate

federal agency and his claim shall have been finally denied by the agency").

### A.  The Rule 52(c) Motion

Following the close of Plaintiff's case-in-chief on October 19, 2019, the United States

moved for judgment under Federal Rule of Civil Procedure 52(c). Trial, Oct. 19, at 4:28 PM.

Rule 52(c) allows a court conducting a bench trial to issue judgment against a party on any claim

or defense based on partial findings, once the evidence from that party has been heard. Fed. R.

Civ. Pro. 52(c); Morales Feliciano v. Rullán, 378 F.3d 42, 59 (1st Cir. 2004) ("When a party has

finished presenting evidence and that evidence is deemed by the trier insufficient to sustain the

party's position, the court need not waste time, but, rather, may call a halt to the proceedings and

enter judgment accordingly."). Therefore, like a Rule 50 motion in a jury trial, Rule 52(c) allows

a court conducting a bench trial to enter judgment on a claim or defense whenever the court can

make a dispositive finding of fact based on the available evidence. Morales Feliciano, 378 F.3d

at 59 (citing Fed. R. Civ. P. 52 advisory committee note).

### a. Whether Plaintiff Failed to Exhaust Administrative Remedies

In arguing for judgment under Rule 52(c), the United States contends that it must prevail over Plaintiff's negligent infliction of emotional distress claims in all three incidents because Plaintiff failed to exhaust his administrative remedies when he did not raise negligent infliction of emotional distress in his administrative complaint. Trial, Oct. 19, at 4:28 PM. Defendant also argues that Plaintiff failed to exhaust administrative remedies by failing to allege invasion of privacy in the administrative complaint. Trial, Oct. 20, at 12:55 PM.

Timely filing an administrative complaint detailing the basis for the tort claim is a jurisdictional prerequisite for filing suit under the FTCA. Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003). Failure to comply with the exhaustion requirements of the FTCA means that a district court lacks subject matter jurisdiction to hear the claim and must dismiss it.[5] See Twum-Baah v. United States Department of Agriculture, 299 F. Supp. 3d 369, 376 (D.P.R. 2018) (dismissing a claim for failure to exhaust when plaintiff's administrative complaint alleged discrimination rather than tortious conduct); Skwira, 344 F.3d at 71. To exercise jurisdiction, a district court must examine whether the administrative complaint sufficiently notifies the United States of the FTCA claims under the "most favorable reading" of the administrative complaint. Twum-Baah, 299 F. Supp. 3d at 375. Requiring that a plaintiff sufficiently describe their claims in the administrative complaint serves the purpose of allowing the government to investigate and expedite tort claims against it, potentially leading to settlement and avoiding unnecessary litigation. Id.

---

[5] Although Plaintiff correctly argued at trial that Defendant failed to preserve the affirmative defense of failure to exhaust in the joint proposed pretrial order, the court must raise the issue *sua sponte* because exhaustion of administrative remedies is a requirement for subject matter jurisdiction under the FTCA. McCulloch v. Vélez, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire *sua sponte* into its own subject matter jurisdiction.").

### 1. Administrative Exhaustion of the Negligence Claims

During trial, Plaintiff alleged negligent infliction of emotional distress in all three incidents at the VA facilities—August 5, 2016, January 22, 2018, and May 29, 2018. Defendant is correct that Plaintiff failed to sufficiently allege negligent infliction of emotional distress in his administrative complaint for the August 5, 2016 incident. Plaintiff devoted an entire page of his administrative complaint to the August 5, 2016 incident and its aftermath with his friend Mr. Cruz. Joint Exhibit I, at 4. But, at no point did Plaintiff allege that VA staff were negligent in their treatment of Mr. Cruz or of Plaintiff. Joint Exhibit I, at 4. Instead, Plaintiff alleged that he was intentionally targeted for retaliation and harassment because he was acting as a witness in Mr. Cruz's complaint about the August 5, 2016 incident, and because Plaintiff had other pending claims against VA officials.[6] Joint Exhibit I, at 4. In fact, all the alleged wrongful conduct Plaintiff described in the administrative complaint is intentional rather than negligent: intentional infliction of emotional distress, discrimination, retaliation, abuse, harassment, and breach of the peace. Joint Exhibit I, at 4. Under the most favorable reading of the administrative complaint, there is no indication to the United States that Plaintiff was alleging an FTCA claim based on negligence for the August 5, 2016 incident. Therefore, Plaintiff's claims of negligent infliction of emotional distress for the August 5, 2016 must be dismissed for lack of jurisdiction for failure to exhaust administrative remedies under the FTCA.

In contrast, a favorable reading of the administrative complaint leaves room for a negligence claim stemming from Plaintiff's interaction with Dr. Rodríguez on January 22, 2018. While Plaintiff alleged that Dr. Rodríguez "deliberately" spoke to him in a high tone of voice, the allegations in their totality do not suggest that Dr. Rodríguez's conduct was strictly limited to

---

[6] Plaintiff explicitly dropped the retaliation claim before the court during oral argument on the Rule 52(c) motion. Trial, Oct. 19, at 4:54 PM.

intentional conduct. Joint Exhibit I, at 5. By throwing Plaintiff's papers to the corner of her desk, Dr. Rodríguez's might have intentionally "shamed, humiliated, and disrespected" Plaintiff, but her actions might have just as well negligently "shamed, humiliated, and disrespected" him. Joint Exhibit I, at 5. The acts described in the administrative complaint were not necessarily intentional in nature and could reasonably have been the product of negligence. See Joint Exhibit I, at 5. Therefore, Plaintiff can be said to have properly exhausted his administrative remedies regarding his negligence claim involving Dr. Rodríguez, because the most favorable reading of the administrative complaint could give notice to the United States that the allegations underlying the FTCA claim could involve both intentional and negligent conduct.

Finally, the most favorable reading of the administrative complaint provides notice that Plaintiff may be alleging negligent tortious conduct from the May 29, 2018 incident. The thrust of Plaintiff's administrative complaint clearly centered on Plaintiff's claims that he was illegally detained in the interview room on May 29, 2018, and that his privacy was violated because he was told to hand over his cell phone for a search. See Joint Exhibit I, at 6. Plaintiff also describes being "apathetically" left alone in Ms. Thompson's "office" while she went for her supervisor, and alleges that Mr. García later told him, in violation of the law, that he should stop being treated by his private psychiatrist Dr. Cabrera. Joint Exhibit I, at 6. While Plaintiff specifically alleged that the above conduct was intentional infliction of emotional distress, it could also have been negligent, if the elements of duty, breach, causation, and damages were present. As such, the most favorable reading does permit a finding that Plaintiff alleged negligent conduct during the May 29, 2018 incident, and he therefore properly exhausted his administrative remedies.

### 2.   Administrative Exhaustion of the Violation of Privacy Claim

Plaintiff also asserts that he suffered an invasion of privacy during the May 29, 2018 incident with VA employees Ms. Thompson and Mr. García, in violation of his Puerto Rico constitutional rights. ECF No. 4 at 1, ¶¶ 1.2, 5.2. Defendant argued in asserting its Rule 52(c) motion that no privacy claim was raised in the administrative complaint and therefore Plaintiff did not exhaust his administrative remedies. Trial, Oct. 20, at 12:56 PM. Under the most favorable reading of the administrative complaint, it is clear Plaintiff complained that being required to hand over his phone was a violation of his privacy. Plaintiff alleged in his administrative complaint that he refused to hand over his cell phone "on privacy grounds" after Ms. Thompson told him she would have "to see if he was recording or filming their meeting." Joint Exhibit I, at 6. Plaintiff also complained various times in the administrative complaint of being asked to hand over his "personal property," and that he eventually "succumbed and turned over his cell phone." Joint Exhibit I, at 6. The most favorable reading of these facts leads to the conclusion that Plaintiff was alleging a violation of his privacy because he was asked to hand over his cell phone and because Plaintiff understood that surrendering his phone to VA personnel would result in a search of his phone's contents. Therefore, Plaintiff properly exhausted his administrative remedies regarding the privacy claim because he sufficiently notified the United States that his claims involved violations of privacy.

### b.   Whether Plaintiff Preserved his Privacy Claims

Despite having properly exhausted his administrative remedies on his privacy claim, there was controversy between the parties as to whether Plaintiff marshalled a claim for violation of his privacy in the complaint and preserved it for trial in the joint proposed pretrial order. Trial, Oct. 20, at 12:55 PM; 12:58 PM. In the complaint, paragraph 1.2, Plaintiff alleged that the VA

subjected Plaintiff to "undue intrusions into his private life, in violation of his constitutional rights to privacy, dignity, family and honor, under Sections 1 and 8 of Article II of the Puerto Rico Constitution." ECF No. 4 at 1, ¶ 1.2. Furthermore, in paragraph 5.2 of the complaint, Plaintiff uses the common law tort language of invasion of privacy when he asserts that the United States, "through its VA agents and employees, intentionally and/or negligently, caused [Plaintiff] to be subjected to . . . invasion of privacy . . . ." ECF No. 4 at 1, ¶ 5.2 (emphasis added). Therefore, in the complaint, Plaintiff sufficiently alleged violation of privacy rights.

    Nevertheless, Plaintiff failed to preserve his invasion of privacy claim for trial by failing to raise any theory of violation of privacy rights in the joint proposed pretrial order. In the First Circuit, "[i]ssues not included in the final pretrial order are generally waived" because the purpose of the joint proposed pretrial order is "to control the subsequent course of the action." Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 774 (1st Cir. 2010); see also Salemi v. Colorado Pub. Employees' Ret. Ass'n, 747 Fed. Appx. 675, 702 (10th Cir. 2018) ("[T]he final pretrial order supersedes the complaint as to the issues to be presented at trial."); FN Herstal SA v. Clyde Armory Inc., 838 F.3d 1071, 1089 (11th Cir. 2016) (quoting State Treasurer of Mich. v. Barry, 168 F.3d 8, 9–10 (11th Cir. 1999)) ("'[A] pretrial order supersedes the pleadings,' thereby 'eliminating any claims not preserved in the pretrial order.'"). While Plaintiff mentions his privacy concerns as part of his "Factual Contentions" arising from the May 29, 2018 incident (ECF No. 25 at 6), Plaintiff does not mention privacy in his "Statement of Factual Contentions" for trial (ECF No. 25 at 19), nor does Plaintiff mention a common law claim of invasion of privacy, or violations of his Puerto Rico constitutional privacy rights in the statement of his legal theory. See ECF No. 25 at 9–13. Because invasion of privacy is not mentioned as a legal claim in the proposed pretrial order, any invasion of privacy claim was waived by Plaintiff before trial.

Even if Plaintiff had properly preserved his privacy claims in the final pretrial order, it is clear from the evidence shown at trial that plaintiff suffered no violation of his privacy of any sort. Plaintiff testified at trial that during the May 29, 2018 incident, VA employees Ms. Thompson and Mr. García demanded that Plaintiff surrender to them his phone, which he rebuffed by demanding that the VA employees produce a federal search warrant. Trial, Oct. 18, at 10:50 AM. Eventually, after talking to Mr. García and after security was called, Plaintiff alleged that he relinquished his phone to Mr. García. Trial, Oct. 18, at 10:55 AM. On cross-examination, Plaintiff testified he spent a total of two hours inside interview room 126 and then voluntarily surrendered his phone to Ms. Thompson and Mr. García, and they both examined it. Trial, Oct. 19, at 12:04 PM. Despite these allegations, Plaintiff's testimony lacked specificity as to what Ms. Thompson and Mr. García looked at on Plaintiff's phone, how long Ms. Thompson and Mr. García examined his phone, and when and how Plaintiff's phone was returned to him. The testimony of Ms. Thompson and Mr. García provided a much more credible and specific recitation of events.

On direct examination, Ms. Thompson reported that as she began the interview with Plaintiff in room 126, she saw that Plaintiff appeared to have his camera application running on his cell phone. Trial, Oct. 20, at 9:33 AM. Ms. Thompson testified that she told Plaintiff she suspected he was recording their conversation, that recordings were against VA policy, that she did not feel comfortable being recorded, and that she would not continue the interview unless Plaintiff assured her that he was not recording. Trial, Oct. 20, at 9:34–9:36 AM. After Plaintiff told Ms. Thompson that she could not tell him what to do with his phone, and after he failed to provide assurances that he was not recording their conversation, Ms. Thompson went for her supervisor, Mr. García. Trial, Oct. 20, at 9:36 AM. Ms. Thompson also conveyed that after

Mr. García spoke with Plaintiff and after the security guard arrived, Plaintiff agreed to turn off his cell phone and put it in his pocket. Trial, Oct. 20, at 9:44 AM. Ms. Thompson testified that at no point did she demand Plaintiff surrender his phone, nor did she see anyone else demand Plaintiff surrender his phone. Instead, Ms. Thompson assured the court that Plaintiff's phone was "in his possession at all times; under his control during that whole time." Trial, Oct. 20, at 9:44 AM.

Mr. García's testimony was consistent with that of Ms. Thompson. Upon entering interview room 126 and introducing himself, Mr. García testified that he told Plaintiff about Ms. Thompson's concerns, and then explained the VA regulation which prohibited using a cell phone to record after passing through the VA checkpoint. Trial, Oct. 20, at 11:49 AM. Mr. García described Plaintiff as irritated and upset in response, and that Plaintiff told Mr. García that "nobody could tell him to turn his cell phone off." Trial, Oct. 20, at 11:50 AM. Throughout the interaction, Mr. García informed the court that his objective was to get Plaintiff to turn his cell phone off so that he could provide services to Plaintiff. Trial, Oct. 20, at 11:52 AM. Mr. García testified that he did not have possession of Plaintiff's phone at any time, nor did he see Ms. Thompson in possession of Plaintiff's phone. Trial, Oct. 20, at 11:53–11:54 AM. In fact, Mr. García explained that Plaintiff tried to hand Mr. García his cell phone, but Mr. García adamantly refused and said "You don't need to give it to me" while raising his hands to "let [Plaintiff] know . . . I don't need to have it in my possession. I just needed [Plaintiff] to show that it was turned off, that's all." Trial, Oct. 20, at 11:53–11:54 AM. Refusing to take the cell phone is not consistent with Plaintiff's allegation that Mr. García had repeatedly demanded for over an hour that Plaintiff hand over his phone.

During the entire interaction with Plaintiff, neither Ms. Thompson nor Mr. García testified that they or anyone else demanded that Plaintiff physically hand over his phone so that it could be searched. Instead, both Ms. Thompson and Mr. García explained that neither of them ever physically took, held, or searched Plaintiff's phone. Trial, Oct. 20, at 9:44 AM; 11:53–11:54 AM. Both Ms. Thompson and Mr. García consistently testified that the most they asked Plaintiff to do was to turn his cell phone off, and that they even refused to take Plaintiff's phone. Trial, Oct. 20, at 9:34–9:36 AM; 9:44 AM; 11:53–11:54 AM. Ms. Thompson and Mr. García's testimony is consistent with the VA Benefits and Compensation section's posted policy, which states that there is nothing wrong with a veteran having their phone, it is only prohibited that a veteran makes audio or video recordings with their phone. See Joint Exhibit V (Special Notice reading "Taking Photos, Videos of Audio with personal equipment are NOT authorized at this facility"); Trial, Oct. 20, at 12:19 PM (Testifying "You can have [a cell phone], it just can't be recording.").[7] Pursuant to that policy, there was no reason why Ms. Thompson or Mr. García would need to confiscate or search Plaintiff's phone, and they both testified that the phone never left Plaintiff's possession. Because various credible sources showed at trial that Plaintiff's phone was not confiscated or searched—indeed, it never left his possession—Plaintiff cannot sustain a charge that he suffered an invasion of privacy with regard to his cell phone. Therefore, based on the credible evidence adduced at trial, Plaintiff suffered no violation of his privacy rights.

In conclusion, Plaintiff failed to exhaust his administrative remedies on the claim of negligent infliction of emotional distress with respect to the August 5, 2016 incident, but he properly alleged negligent infliction of emotional distress for the January 22, 2018 and May 29, 2018 incidents. As to Plaintiff's claims of privacy violation stemming from the May 29, 2018

---

[7] See n. 3.

incident, Plaintiff waived that claim by failing to raise them in his legal theory section of the Joint Proposed Pretrial Order. Even if the violation of privacy rights claim had been preserved, administrative remedies exhausted, and the claim could survive the Rule 52(c) motion, Plaintiff still failed to prove at trial that he suffered any sort of privacy violation whatsoever.

### c.   Whether Plaintiff Failed to Prove Intentional Infliction of Emotional Distress

#### 1.   Extreme and Outrageous Conduct Under the Common Law

During her Rule 52(c) argument, Defendant also contended that to show intentional infliction of emotional distress, Plaintiff must prove that Defendant's conduct, or conduct of its agents, was extreme, outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. Trial, Oct. 19, at 4:33 PM. Defendant asserts in its Rule 52(c) motion that the VA employees' conduct in the three alleged incidents falls far short of the standard of extreme and outrageous conduct. Trial, Oct. 19, at 4:36–4:37 PM.

Defendant is correct that to prevail on a common law claim of intentional infliction of emotional distress Plaintiff must prove by a preponderance of the evidence that Defendant's actions were extreme, outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. Thorpe v. Mut. of Omaha Ins. Co., 984 F.2d 541, 545 (1st Cir. 1993) (conduct must be "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community"). Even in light of all the evidence Plaintiff presented, none of the three incidents in question display conduct that rises to the level of extreme and outrageous.

On August 5, 2016, Mr. Viches' remarks to Mr. Cruz exhibited a lack of respect for a World War II combat veteran deserving of the utmost esteem and gratitude—particularly by an employee tasked to care for our heroic veterans. Trial, Oct. 18, at 9:50 AM. Although it is

disappointing how Mr. Viches spoke to Mr. Cruz, a lack of respect, rudeness, and ingratitude cannot be said to rise to the level of conduct that is extreme, outrageous, and utterly intolerable in a civilized community.

Similarly, Plaintiff's evidence concerning his interaction with Dr. Rodríguez on January 22, 2018 fails to demonstrate extreme or outrageous conduct. Dr. Rodríguez might have been markedly inconsiderate in how she spoke to Plaintiff. Trial, Oct. 18, at 9:57 AM. Her behavior in tossing Plaintiff's papers to a corner of the desk could even be characterized as unprofessional and exhibiting a lack of compassion. Trial, Oct. 18, at 9:58–9:59 AM. Still, it cannot be said that her acts were utterly intolerable in a civilized community and completely outside the bounds of decency.

Finally, perhaps on May 29, 2018 Thompson and García were unreasonably accusing Plaintiff of violating the VA cell phone policy when it was unclear if Plaintiff was even recording at all. Trial, Oct. 19, at 11:57 AM; 2:12–2:14 PM. Nevertheless, it was not extreme or outrageous for Ms. Thompson and Mr. García to ask that Plaintiff surrender his phone. Trial, Oct. 18, at 10:36 AM; Trial, Oct. 19, 2:14 PM. Defendant is therefore correct that Plaintiff has failed to show an essential element of a claim of common law intentional infliction of emotional distress.

### 2.  Puerto Rico Civil Code § 1802 Liability

On the other hand, some of Plaintiff's arguments during the Rule 52(c) motion also have merit. Plaintiff's counsel responded to Defense counsel with a nuanced legal argument predicated on an idiosyncrasy of Puerto Rico tort law. First, Plaintiff acknowledged he did not produce any evidence that would show that any VA employee's conduct was severe or outrageous. See Trial, Oct. 19, at 5:00 PM. Thus, Plaintiff's counsel affirmatively stated that

Plaintiff was no longer pursuing a theory of common law intentional infliction of emotional distress or common law negligent infliction of emotional distress. Trial, Oct. 19, at 5:00 PM. Instead, Plaintiff asserted he was proceeding on claims based on § 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. Tit. 31, § 5141. Trial, Oct. 19, at 5:00–5:02 PM. This is because, as Plaintiff explained during a colloquy with the court, tort liability under the Puerto Rico Civil Code is much broader than under the common law, and liability of a defendant can be established through either "fault" or "negligence"—without reference to extreme or outrageous conduct. Trial, Oct. 19, at 5:00–5:02 PM. Therefore, while Plaintiff's counsel conceded he could not prevail under common law intentional infliction of emotional distress, he asserts he can still prevail under § 1802 of the Puerto Rico Civil Code. Trial, Oct. 19, at 5:02 PM.

The standard for tort liability under § 1802 of Puerto Rico's Civil Code is wide-ranging. Section 1802 provides, "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. Tit. 31, § 5141. As remarked by this court in Clemente v. United States, 426 F. Supp. 1, 2 (D.P.R. 1977), "suffice it to say that [§ 1802] establishes what is probably the broadest basis for tort liability in any jurisdiction of the United States."

"The concept of fault of § 1802 of the Civil Code— 1930 ed.—is infinitely embracing, as ample and embracing as human conduct is." Reyes v. Heirs of Sanchez Soto, 98 D.P.R. 305, 310 (1970). "Fault" under § 1802 could be "committed knowingly and willfully" or could simply be an act "willful or not, of a person which produces a wrong or damage." Id. Hence, "the wrongdoer who is guilty of fault or negligence, whatever the consequences may be, is bound to repair the wrong . . . ." Id. at 311–12 (emphasis added). In light of this broad standard, the First Circuit has recognized that tort liability under § 1802 consists of three elements: "(1) evidence of

physical or emotional[8] injury, (2) a negligent or intentional act or omission (the breach of duty element), and (3) a sufficient causal nexus between the injury and defendant's act or omission (in other words, proximate cause)." <u>Vázquez-Filippetti v. Banco Popular de Puerto Rico</u>, 504 F.3d 43, 49 (1st Cir. 2007) (emphasis added). In sum, tort liability under § 1802 of the Puerto Rico Civil Code can be understood to encompass <u>both</u> intentional and negligent torts causing emotional damage—acts that under the common law are normally understood as two different torts: intentional infliction of emotional distress, and negligent infliction of emotional distress. Also, the elements required to prove a claim for intentional or negligent emotional harm under § 1802 are nearly identical, and they lack the additional requirements usually imposed on these causes of action by the common law.[9]

This arrangement is so atypical that the First Circuit has sometimes applied the broader reading of § 1802, while at other times has applied the traditional common law approach as found in the Restatements. <u>Compare</u> <u>Vázquez-Filippetti</u>, 504 F.3d at 49 (Applying three elements under Puerto Rico tort law: "(1) evidence of physical or emotional injury, (2) a negligent or intentional act or omission (the breach of duty element), and (3) a sufficient causal nexus between the injury and defendant's act or omission") <u>with</u> <u>Soto-Lebrón</u>, 538 F.3d at 57

---

[8] Recovery for pure emotional harm is also permitted under Puerto Rico Civil Code § 1802. <u>Jiménez-Nieves v. United States</u>, 618 F. Supp. 66, 69 (D.P.R. 1985) ("Under Article 1802, the right to claim damages in ex delicto actions, for humiliation and mental sufferings, independent of the existence of physical damages, has been long established in this jurisdiction.") (citing <u>Muriel v. Suazo</u>, 72 P.R.R. 348, 352 (1951)).

[9] For example, intentional infliction of emotional distress usually requires a showing that the defendant's conduct was "extreme and outrageous." <u>Soto-Lebron v. Federal Express Corp.</u>, 538 F.3d 45, 57 (1st Cir. 2008); <u>Santiago-Ramírez v. Secretary of Dept. of Defense</u>, 62 F.3d 445, 448 (1st Cir. 1995) (citing Restatement (Second) of Torts § 46 (1965)). Many other jurisdictions only permit claims for "negligent infliction of emotional distress" when the defendant "places the person seeking recovery in danger of bodily harm but actually causes only emotional harm" or "when the negligent conduct occurs within certain classes of activities, undertakings, and relationships in which the conduct does not create a risk of bodily harm but nevertheless poses a significant risk of serious emotional harm." Restatement (Third) of Torts § 47. At least one jurisdiction in the First Circuit, Massachusetts, also requires a Plaintiff to show, in addition to the typical elements of negligence, a "physical harm manifested by objective symptomatology; and that a reasonable person would have suffered emotional distress under the circumstances of the case." <u>Doe v. Trustees of Bos. Coll.</u>, 892 F.3d 67, 95 (1st Cir. 2018) citing (<u>Payton v. Abbott Labs</u>, 437 N.E.2d 171, 181 (Mass. 1982)).

(asserting that "Under Puerto Rico law, the four elements of a claim for intentional infliction of emotional distress are: 1) that the defendant engaged in extreme and outrageous conduct; 2) that such conduct was intended to cause the plaintiff severe emotional distress, or was done with reckless disregard for the plaintiff's emotional state; 3) that the plaintiff suffered severe emotional distress; and 4) that the severe distress is causally related to the extreme and outrageous conduct."). Under either test, Plaintiff must prove each element by a preponderance of the evidence. López Vázquez v. Hosp. Presbiteriano, Inc., 107 D.P.R. 197, 221 (1978) ("Pursuant to art. 1802 of the Civil Code, 31 L.P.R.A. § 5141, civil liability requires, as a previous condition for compensation, that the causal relation between the damage claimed and the negligent act charged be proved by preponderance of evidence . . . .")

Plaintiff, through counsel, conceded in open court that none of the actions allegedly committed by VA employees reach the level of extreme or outrageous conduct and he expressly desisted from any theory of recovery premised on "common law" intentional or negligent infliction of emotional distress. Trial, Oct. 19, at 5:00 PM. Because Plaintiff has affirmatively desisted from his common law claims, and because it is clear from the evidence that none of the VA employees' actions were extreme or outrageous, Defendant's motion to dismiss that claim under Rule 52(c) is granted. Nevertheless, Plaintiff argues that he could still recover under the very broad interpretation of Puerto Rico Civil Code § 1802 liability based on "fault or negligence." Trial, Oct. 19, at 5:00–5:02 PM. To leave no stone unturned, it is necessary that the court also address Plaintiff's broader claim for recovery under § 1802 in light of all the evidence presented at trial.

**B.  Findings of Fact and Conclusions of Law as to the Merits at Trial**

Plaintiff argues he is entitled to judgment for intentional or negligent infliction of emotional distress under § 1802 of the Puerto Rico Civil Code from the August 5, 2016 incident with Mr. Viches, the January 22, 2018 incident with Dr. Rodríguez, and the May 29, 2018 incident with Ms. Thompson and Mr. García. ECF No. 4 at 3, 5, 7. The court now examines all evidence presented at trial to determine whether Plaintiff has sustained his burden of proof to recover under § 1802 of the Puerto Rico Civil Code.

As discussed above, to prevail under the broadest interpretation of § 1802, Plaintiff must prove by a preponderance of the evidence, a (1) physical or emotional injury, (2) a negligent or intentional act or omission, and (3) a sufficient causal nexus between the injury and defendant's act or omission. In sum, Plaintiff may recover if VA employees either intentionally or negligently caused Plaintiff to suffer an emotional injury. Vázquez-Filippetti, 504 F.3d at 49; López Vázquez, 107 D.P.R. at 221. As with torts generally, Puerto Rico still requires the key elements of duty and foreseeability.

To be liable in tort in Puerto Rico, a defendant must breach a pre-existing duty to the plaintiff, through an intentional or unintentional act or omission. Id. In Reyes, the Puerto Rico Supreme Court pronounced that:

> [O]rderly social living imposes a general duty of correctness and prudence toward the other citizens, and the act is unlawful in the extracontractual sense when it violates the general duties of social correctness or of proper behavior, which duties are not written in the codes but which represent the presupposed minimum inference of the order of social life.

Reyes, 98 D.P.R. at 312 (internal quotation and emphasis omitted). While the language in Reyes gives cause to question what exactly a "duty of correctness," "social correctness," or "proper

behavior" entails,[10] in applying Puerto Rico law, the First Circuit has declared that "the duty is

defined by the general rule that one must act as would a prudent and reasonable person under the

circumstances." Vázquez-Filippetti, 504 F.3d at 49 (citing Ortiz v. Levitt & Sons of P.R., Inc.,

101 D.P.R. 290 (1973); Pacheco Pietri v. ELA, 133 D.P.R. 907 (1993) (Alonso, J., dissenting)

("[T]he negligent act is defined as a breach of the duty imposed or recognized by law, to act, as

would a prudent and reasonable man, . . . in order not to expose to foreseeable and unreasonable

risks of damages, as a result of the actor's behavior, those persons who . . . a prudent and

reasonable man would have foreseen . . . would be exposed to the unreasonable risk created by

the actor.") (internal citations omitted)). Foreseeability is the central issue in actions for tort

under Puerto Rico law, because it is an element of both breach and proximate cause. Vázquez-

Filippetti, 504 F.3d at 49. A plaintiff bears the burden of showing that the defendant or

defendants acted in such a way that a reasonably prudent person would foresee as creating undue

risk of emotional harm. See id. In this case, Plaintiff failed in his burden to show that any VA

employee during any of the three incidents intentionally caused him emotional harm or breached

the standard of care, leading to negligence.

### a.  The Incident with Mr. Viches, August 5, 2016

Turning to the first of the three incidents, Plaintiff must first prove that VA employee

Mr. Viches committed a tort leading to emotional harm to Plaintiff on August 5, 2016. Because

Plaintiff failed to raise a claim for negligent infliction of emotional distress for this incident in

his administrative complaint, the only claim available to Plaintiff which he administratively

exhausted is the tort for intentional conduct by Mr. Viches under § 1802. Nonetheless, it is clear

---

[10] Indeed, in a colloquy with Plaintiff's counsel the court asked, "Are you suggesting by 'duty of correctness' a duty
to be polite?" to which Plaintiff's counsel responded "No, your Honor. I am referring to the duty I mentioned earlier,
which is the general rule that a person must act as a prudent and reasonable person under the circumstances . . . ."
Trial, Oct. 19, at 5:09 PM.

from the facts that Mr. Viches' conduct did not breach any duty on August 5, 2016—either intentionally or unintentionally.

The harmful words allegedly spoken by Mr. Viches were not even directed at Plaintiff but rather were uttered to his friend Mr. Cruz. Trial, Oct. 18, at 9:50 AM. Nevertheless, Puerto Rico law establishes an extremely permissive scope of duty towards third persons who are relatives by blood or marriage to the injured person. Santini River v. Serv Air, Inc., 137 D.P.R. 1, 10 (1994). This duty extends to pure emotional harm suffered by the third person: "[N]ot only is the harm suffered by the victim or person directly affected by a tortious or negligent act compensable in damages, but that also compensable is the moral (emotional) harm experienced by the persons related . . . by blood ties or by affection and love to the victim or aggrieved party." Id. (internal quotations omitted). Generally, however, the duty arising from "affection and love" is limited to actual relatives or to the injured person's spouse. Id. ("We have repeatedly recognized that a person is entitled to compensation for the sufferings, emotional distress or mental anguish experienced as a consequence of the material or other damages caused directly to . . . his or her spouse or other relative . . .") (emphasis added). The harm suffered by the relative or loved one can include pure emotional harm such as insults and racial discrimination. Id.; See also García Pagán v. Caribbean, 122 D.P.R. 193, 200–01 (1988) (both citing Muriel v. Suazo, 72 P.R.R. 348 (1951)).

In this case, Plaintiff testified repeatedly that he considers Mr. Cruz a "dear friend" and "fatherlike figure." Trial, Oct. 18, 9:39 AM; 9:46 AM; 12:21 PM. Plaintiff's counsel argued that although Mr. Cruz and Plaintiff are not actually related, the court should suppose that Mr. Cruz was Plaintiff's father, and examine the emotional harm as if someone treated Plaintiff's father in the same way. Trial, Oct. 19, 5:07 PM. Plaintiff's relationship with Mr. Cruz, although arguably

one of "affection and love," does not meet the threshold under Puerto Rico law. Plaintiff and Mr. Cruz are not actual relatives by blood, marriage, or adoption—no matter how close they feel. Therefore, Mr. Viches did not have a duty toward Plaintiff, and Plaintiff's claim stemming from the August 5, 2016 incident must fail for lack of a duty.

Even if Plaintiff's relationship with Mr. Cruz were enough under Puerto Rico law to create a duty between Mr. Viches and Plaintiff, it is clear from the evidence that Mr. Viches did not breach such a duty with either intentional or negligent conduct. There was no evidence presented at trial to suggest that Mr. Viches was intentionally trying to emotionally harm Mr. Cruz or Plaintiff. According to Plaintiff's testimony, Mr. Viches "scolded the senior citizen with a high tone of voice and waving his hands" and said, "Listen, you had intention to see your representative and when your representative was available you were not in the area." Trial, Oct. 18, at 9:50 AM. Even so, nothing Mr. Viches said was untrue, an insult, or clearly calculated to cause emotional harm. Nor would it be foreseeable that chastising Mr. Cruz for leaving the waiting area would somehow cause emotional harm to Plaintiff who was accompanying him. Perhaps Mr. Viches should have moderated his tone and gestures, but what Mr. Viches said did not create an undue risk of harm merely by being impolite. As discussed previously, it is disappointing that a VA employee would treat a World War II combat veteran with such little respect, but a failure to show respect or to behave politely does not rise to the level of a tort— even under the broad standard under Puerto Rico Civil Code § 1802.

### b.  The Incident with Dr. Rodríguez, January 22, 2018

The second incident at bar occurred on January 22, 2018 with VA psychiatrist Dr. Rodríguez. Plaintiff must have proved at trial that Dr. Rodríguez intentionally or negligently caused emotional distress to Plaintiff. Yet the evidence at trial does not prove by a

preponderance of the evidence that Dr. Rodríguez either intentionally or negligently breached a duty of care during the incident in question.

Plaintiff and Dr. Rodríguez got off on the wrong foot from the start. Plaintiff testified that during his compensation and pension exam with Dr. Rodríguez on January 22, 2018, Dr. Rodríguez asked Plaintiff to describe his depression symptoms. Trial, Oct. 18, at 9:56 AM. Plaintiff then proceeded to describe how when he felt stressed, he would forget the names of his two grandsons. Trial, Oct. 18, at 9:57 AM. After Plaintiff started talking about his family, he alleged that Dr. Rodríguez "cut him off" from explaining more and said in a high tone of voice, "All you are the same. I asked you to tell me your depression symptoms and you commenced talking about your family." Trial, Oct. 18, at 9:57 AM. While perhaps lacking courtesy and appropriate bedside manner, Dr. Rodríguez's interruption was not unreasonable if she believed, even mistakenly, that Plaintiff was talking about a different topic than she initially asked. Certainly nothing suggests Dr. Rodríguez cut Plaintiff off to intentionally harm him emotionally, or that such an act posed an undue foreseeable risk of emotional harm to Plaintiff.

After being interrupted, Plaintiff informed the court that he produced some documents that included medical reports by Plaintiff's private neurologist Dr. Heriberto Acosta and Plaintiff's treating psychiatrist Dr. Fernando Cabrera. Trial, Oct. 18, at 9:58 AM. Plaintiff described how when he handed Dr. Rodríguez those documents, she "tossed [them] up at the corner of her desk" which "shocked" Plaintiff and made him "angry," "upset," and "nervous." Trial, Oct. 18, at 9:58–9:59 AM. Again, nothing in this interaction suggests that Dr. Rodríguez tossing Plaintiff's medical reports was calculated to intentionally cause him emotional distress. Likewise, casually tossing those reports to the corner of the desk while Plaintiff and Dr. Rodríguez talked was not unreasonable and did not foreseeably produce an undue risk to

Plaintiff's emotional health. Even if Dr. Rodríguez's actions appeared nonchalant or even dismissive to Plaintiff, they certainly were not tortious.

Additionally, Plaintiff's testimony about this incident showed some issues of credibility. Plaintiff testified that Dr. Rodríguez did not even read his medical reports and dismissively tossed them to a corner of the desk. However, right after allegedly tossing the reports, Plaintiff testified that Dr. Rodríguez told him "The diagnoses of Dr. Cabrera and Dr. Acosta are erroneous, because you mislead them by talking too much." Trial, Oct. 18, at 9:59–10:00AM. It does not make sense that during one part of his testimony Plaintiff says Dr. Rodríguez did not read the reports, and then a moment later he quotes Dr. Rodríguez as she referred to the diagnoses of the two doctors by name—Dr. Acosta and Dr. Cabrera—whose reports she allegedly had not read. This inconsistency gives pause as to the veracity of Plaintiff's version of events with Dr. Rodríguez.

Moreover, Defendant introduced evidence on cross-examination that Dr. Rodríguez did not improperly discount the reports she allegedly threw into the corner of her desk. Plaintiff was confronted on cross-examination with Dr. Rodríguez's subsequent evaluation, which expressly references both reports that Plaintiff brought to Dr. Rodríguez. Joint Exhibit XII, at 42 ("As per private psychiatric report from Fernando Cabrera JR, MD dated 1/15/2018 {brought by veteran} . . ."), 43 ("As per private Neurologist's report dated 1/17/2018 by Dr. Heriberto Acosta it states . . ."); Trial, Oct. 18, at 2:36–2:40 PM. Plaintiff explained away this fact by speculating that Dr. Rodríguez must have included that information after he left her office, because he did not tell her any of the information included in her report. Trial, Oct. 18, at 2:38 PM; 2:39 PM. At a later point in the cross-examination, Plaintiff admitted that it did appear that Dr. Rodríguez had

included the information in her evaluation from the reports that he handed to her. Trial, Oct. 18, at 2:54–2:56 PM.

Plaintiff also reported that after Dr. Rodríguez told him that the diagnoses of doctors Acosta and Cabrera were incorrect, he began to argue with Dr. Rodríguez, telling her she was being unethical by refuting the diagnoses of another fellow psychiatrist. Trial, Oct. 18, at 10:00 AM. Plaintiff also said to Dr. Rodríguez that he was going to remove the "doctor" from her title and only refer to her as "Ms. Carmen Rodríguez Rodríguez." Trial, Oct. 18, at 3:00 PM. Dr. Rodríguez responded by saying "If you want you can look me up on the web, I'm also board certified, I could opine also." Trial, Oct. 18, at 10:00 AM. Following that exchange, Plaintiff alleged that Dr. Rodríguez "threatened" him by saying "If you would like I could stop this exam and ask another VA psychiatrist to perform it." Trial, Oct. 18, at 10:01 AM.

Plaintiff is incorrect that it was unethical for Dr. Rodríguez to contradict the diagnosis of another psychologist—Plaintiff had indeed come to the VA hospital so that Dr. Rodríguez could form an opinion on Plaintiff's entitlement to aid and attendance. See Trial, Oct. 18, at 2:37 PM. It is not necessarily unethical or unreasonable for a qualified psychiatrist to come to a different opinion than another psychiatrist. Nothing about this exchange indicates tortious conduct. Dr. Rodríguez was apparently defending herself from accusations of unethical behavior. Far from threatening Plaintiff, Dr. Rodríguez offered to let a different psychiatrist take over the exam. Trial, Oct 19, at 9:43 AM. Plaintiff declined this option. Trial, Oct 19, at 9:43 AM. Dr. Rodríguez's behavior was not unreasonable or imprudent, and it was certainly not intended or foreseeable to cause Plaintiff emotional harm. At worst, Dr. Rodríguez's behavior was a defensive response to an opinion she offered that was at odds with Plaintiff's private physicians.

What is also clear from the evidence is that Plaintiff responded with heightened sensitivity to what Dr. Rodríguez said and did during the January 22, 2018 examination. He perceived most of Dr. Rodríguez's statements as slights, insults, and threats. This sensitivity seems to have altered how Plaintiff perceived his interaction with Dr. Rodríguez, leading him to assume that Dr. Rodríguez was acting maliciously. For example, Plaintiff testified that as he was leaving Dr. Rodríguez's office, she smiled at him and said, "Give Dr. Cabrera my regards." Trial, Oct. 18, at 10:01 AM. Plaintiff explained that he felt this comment was a "gesture of sarcasm" and was "insulting"—apparently concluding that this comment was maliciously made. Trial, Oct. 19, at 11:24 AM. However, Plaintiff admitted on cross examination that it had not occurred to him that Dr. Rodríguez's comment was made because she knew Dr. Cabrera. Trial, Oct. 19, at 11:24 AM. In fact, Dr. Cabrera testified as an expert witness during trial, and he mentioned that he personally knew and had previously "been the chief of" Dr. Rodríguez. Trial, Oct. 19, at 4:13 PM. Plaintiff admitted that such a possibility did not occur to him because "Honestly, I was mentally and emotionally unstable." Trial, Oct. 19, at 11:24 AM. Therefore, the evidence at trial shows that Plaintiff was quick to conclude that Dr. Rodríguez was antagonizing him, which colored most, if not all, of his interaction with the VA psychiatrist.

In sum, the evidence produced at trial gives cause to doubt whether Plaintiff's version of events in Dr. Rodríguez's office was truly as offensive, combative, or disrespectful as Plaintiff describes. It certainly appears probable Plaintiff was reading into Dr. Rodríguez's behavior much more than would be normal or reasonable under the circumstances, and Plaintiff presented problems of credibility during his testimony. Moreover, evidence at trial showed that Plaintiff himself became angry, irritated, and confrontational with Dr. Rodríguez.

Hence, Plaintiff fails in his burden to show by a preponderance of the evidence that Dr. Rodríguez committed an intentional or negligent tort under § 1802 of the Puerto Rico Civil Code. At worst, Dr. Rodríguez may have been uncourteous, short, and lacking in an appropriate bedside manner, but nothing she did could be construed as an intentional attempt to inflict emotional harm on Plaintiff. Likewise, nothing she did was reasonably foreseeable to cause an undue risk of emotional harm to Plaintiff. In sum, Dr. Rodríguez did not commit a tort on January 22, 2018.

### c.  The Incident with Thompson and García, May 29, 2018

Finally, in contrast to the first two incidents, where the evidence at least suggests that VA employees might have behaved ill-mannered or unprofessionally, nothing that occurred on May 29, 2018 indicates that VA employees did anything wrong—much less tortious. Therefore, Plaintiff fails to show that the United States is liable for intentional or negligent infliction of emotional distress from the May 29, 2018 incident under § 1802 of the Puerto Rico Civil Code.

First, evidence at trial established that Plaintiff was aware of the policy against using cell phones to record audio or video at the VA facility in Guaynabo. The evidence shows that a dispute over this policy is what led to the incident on May 29, 2018. Both parties presented evidence that inside the VA Benefits and Compensation Section signs were posted that read "Special Notice: Taking Photos, Videos, or Audio with personal equipment are NOT authorized at this facility," which included an image of a cell phone behind a red prohibition symbol (hereinafter "special notice sign"). Exhibit IV. The signs were posted at least at the building's lobby, before entering interview room 126, and arguably at its entrance. Joint Exhibits III, IV, V, and IX.[11]

---

[11] <u>See</u> also n. 3.

Plaintiff testified that he had no notice of the VA policy because on May 29, 2018 none of the special notice signs had yet been posted. Trial, Oct 19, at 11:25–11:49 AM. Plaintiff argues that every one of the special notice signs only later appeared after his altercation with VA employees on May 29, 2018. Trial, Oct 19, at 11:49–11:50 AM. However, the court finds more credible the testimony of VA employees Thompson and García. As full time, daily employees at the VA Benefits and Compensation Section, Thompson and García would be more able to accurately testify as to the presence of the special notice signs on the date in question.[12] Ms. Thompson explained that since she began working at the VA Compensation and Benefits Section in 2016, the special notice signs had been posted throughout the facility. Trial, Oct. 20, at 9:13–9:15 AM. She unequivocally testified that the special notice signs had specifically been posted at the entrance, in the lobby, and outside of interview room 126. Trial, Oct. 20, at 9:15-9:23 AM. Likewise, Mr. García further clarified that the special notice signs had been posted in the VA Benefits and Compensation Section at least since he started working there in 2012. Trial, Oct. 20, at 11:28 AM; 11:36–11:38 AM; 11:43 AM. Specifically, Mr. García stated that since 2012 the special notice signs were posted at the entrance of the facility, in the lobby, outside the door to interview room 126, and inside of all the interview rooms, including room 126. Trial, Oct. 20, at 11:28 AM; 11:36–11:38 AM; 11:43 AM; Joint Exhibit X.

The testimony at trial established that the signs do not communicate that it is prohibited to possess a cell phone, to have it turned on, or to use the phone. Trial, Oct. 20, at 9:23 AM; 12:19 PM (Mr. García testifying "You can have [a cell phone], it just can't be recording."); See also Joint Exhibit V. But the special notice signs do prohibit using a cell phone, or any other personal device, to record video or audio within the VA facility. Joint Exhibit V; Trial, Oct. 20,

---

[12] In contrast, Plaintiff testified that he visits the VA Benefits and Compensation Section only about "three or four times a year, maybe." Trial, Oct. 18, at 10:53 AM.

at 9:23 AM; 11:28 AM. Based on the testimony of VA employees who are intimately familiar with the space at the VA benefits and compensation section, Plaintiff knew or should have known that he could not use his cell phone to record audio and video inside the VA facility.

Even though Plaintiff knew or should have known about the VA policy against cell phone recordings, the evidence at trial showed that there was a misunderstanding about whether Plaintiff was improperly recording video when he began his interview with Thompson. Plaintiff testified that at the beginning of the interview with Ms. Thompson, he withdrew his cell phone "from its case to make sure it was on vibration mode" as a "gesture of courtesy." Trial, Oct. 18, at 10:35 AM. Ms. Thompson reported at trial that while Plaintiff had his phone in his hand, she saw what she believed to be Plaintiff's camera application open on his phone screen. Trial, Oct. 20, at 9:33 AM. No testimony at trial convincingly showed that Plaintiff was attempting to record audio or video on his phone. Rather, the totality of the evidence suggests that Plaintiff was most likely putting his phone on vibrate mode, and Ms. Thompson simply saw something on Plaintiff's screen that gave her cause for concern. Consequently, a misunderstanding arose between Ms. Thompson and Plaintiff about what he was doing with his phone.

The testimony of Plaintiff and Ms. Thompson agree that Ms. Thompson confronted Plaintiff about her suspicion that he was recording their conversation and informed him of the VA policy regarding cell phone recordings. Trial, Oct. 20, at 9:34–9:36 AM. Ms. Thompson testified that she first told Plaintiff that he thought his phone might be recording. Trial, Oct. 20, at 9:33 AM. When Plaintiff denied that he was recording, Ms. Thompson asked Plaintiff to turn off his phone or check that he was not recording, and he refused. Trial, Oct. 20, at 9:34–9:36 AM. When Plaintiff refused to turn off his cell phone, Ms. Thompson told Plaintiff she did not feel comfortable being recorded. Trial, Oct. 20, at 9:34 AM. Ms. Thompson's reaction was not

unreasonable or intentionally calculated to cause Plaintiff emotional harm. Instead,

Ms. Thompson and Plaintiff were having a disagreement about what exactly he was doing with

his phone that required the intervention of Thompson's supervisor. So, Thompson left interview

room 126 to find a supervisor. Trial, Oct. 20, at 9:36 AM.

     Plaintiff alleged at trial that once Ms. Thompson departed, he was left alone for "about an

hour" before Thompson returned with Mr. García. Trial, Oct. 18, at 10:36–10:37 AM. Plaintiff

provided no explanation as to why he was waiting for such a long time. On this point, the VA

employees' version of events is much more credible. Ms. Thompson testified at trial that it takes

approximately three minutes to walk from interview room 126 to the directors' offices on the

second floor and back. Trial, Oct. 20, at 9:37 AM. Similarly, Mr. García conveyed that it would

take about three minutes to walk from the directors' offices to interview room 126. Trial, Oct.

20, at 11:48 AM. Testimony from employees who have walked this distance indicates that

Plaintiff was left alone for much less time than the hour he alleges. Furthermore, the evidence at

trial established that Ms. Thompson left, got Mr. García, and then they immediately returned to

room 126—they did nothing else to cause further delay than the time it took to walk between the

two rooms. See Trial, Oct. 20, at 9:37 AM; 11:48 AM.

     Plaintiff's allegations that he was left for an hour also do not make sense in context of the

number of veterans the employees at the VA benefits and compensation section must see in a

single day. Ms. Thompson informed the court that she is expected to interview eighteen veterans

per day to meet her monthly quota. Trial, Oct. 20, at 10:20 AM. To maintain pace, both

Ms. Thompson and Mr. García testified that VA employees are given guidance to spend only

twenty minutes with each veteran. Trial, Oct. 20, at 10:20 AM; 11:53 AM. If Ms. Thompson had

oddly left Plaintiff alone in room 126 for an entire hour, that would mean Ms. Thompson would

have lost the time to see at least two other veterans in addition to Plaintiff, thus putting her

greatly behind on her daily quota. Considering her quota, Ms. Thompson had every incentive to

get Mr. García and return as quickly as possible, rather than inexplicably wasting an hour by

leaving Plaintiff isolated in room 126.

In sum, the evidence shows that Ms. Thompson intentionally confronted Plaintiff when

she reasonably suspected he was using his cell phone to record video or audio. Her behavior was

proper and in accordance with VA regulations. Ms. Thompson confronted Plaintiff because of

the VA policy, not because she was trying to cause Plaintiff emotional harm. Additionally,

Plaintiff was aware of the VA policy against using cell phones to record inside the facility, but

still refused to turn off his phone despite Ms. Thompson's requests. Moreover, it certainly was

not foreseeable to Ms. Thompson that discussing the cell phone policy, asking him to turn off his

phone, and then leaving Plaintiff alone for a few minutes would pose an undue risk of emotional

harm to Plaintiff. In fact, it was a reasonable response for Ms. Thompson to take a few minutes

to get Mr. García. As explained by Mr. García, going for a supervisor was the correct protocol in

this scenario. Trial, Oct. 20, at 11:45 AM.

Ms. Thompson and Mr. García's subsequent acts also did not indicate a breach of the

duty of care. All the witnesses' testimony agreed that once Mr. García arrived, he elaborated to

Plaintiff the VA regulation on cell phones inside the facility. Trial, Oct. 19, at 12:10 PM. All the

witnesses agree that a security guard was eventually called. Once again, significant parts of

Plaintiff's testimony suggest he did not accurately testify as to events on May 29, 2018. First,

Plaintiff provides no good explanation for why a security guard was called. He alleges that after

explaining the cell phone policy, Mr. García suddenly demanded that Plaintiff "call Dr. Cabrera"

because "Mr. Cabrera isn't helping you at all." Trial, Oct. 18, at 10:46–10:48 AM. Plaintiff

34

alleges he politely refused to call Dr. Cabrera, after which Mr. García abruptly told

Ms. Thompson to call a security guard. Trial, Oct. 18, at 10:49 AM. Why Plaintiff's polite

refusal to call his private psychiatrist would prompt Mr. García to call security was not explained

by Plaintiff.

 In contrast, Ms. Thompson and Mr. García both clarified that they called a security guard

when Plaintiff refused to turn off his phone (Trial, Oct. 20, at 9:40 AM) and after Plaintiff

became loud, threatened to sue, and began hitting the table with his fists. Trial, Oct. 20, at 11:56–

11:57 AM. The most credible explanation of events is that security was called because a

disagreement had escalated to the point where there emerged a safety risk in room 126. Trial,

Oct. 20, at 11:56–11:57 AM.

 Second, Plaintiff's testimony as to the length of the encounter was also not credible.

Plaintiff testified that once Mr. García arrived, he was kept for an additional hour speaking to

Mr. García after he had already been left alone in the room for "about an hour." Trial, Oct. 19, at

12:08–12:11 PM. As described above, such long periods of time are not believable because they

would have dramatically reduced the amount of time the VA employees would have been able to

see other veterans at the facility. Trial, Oct. 20, at 10:20 AM; 11:53 AM. Effectively, if Plaintiff

had spent a total of two hours in interview room 126, that would have been the time the VA

benefits and compensation section sets aside to attend to six different veterans. Trial, Oct. 20, at

11:53 AM. Such a large amount of time—although not theoretically impossible—would have

been unworkable in this VA facility which, as Mr. García testified, must see between 170 and

250 veterans in a single day with only fifteen employees. Trial, Oct. 10, at 11:52 AM.

 In addition, Ms. Thompson estimated that Mr. García's discussion with Plaintiff took

"more than twenty minutes, [but] less than an hour" (Trial, Oct. 20, at 10:20 AM) and Mr. García

agreed that "basically" "twenty to thirty minutes elapsed" between when he entered the room and when he asked Ms. Thompson to call security. Trial, Oct. 20, at 12:23 PM. Accordingly, the most likely timeline of events suggests that the entire incident on May 29, 2018 lasted approximately one hour or slightly longer—about half the time alleged by Plaintiff.

Finally, Plaintiff's testimony lacked detail as to what happened after he allegedly handed over his phone and the incident was concluded. For example, Plaintiff testified that Mr. García and Ms. Thompson returned his phone, but he could not remember "the frame of time" in which they returned it. Trial, Oct. 19 at 2:18 PM. In contrast, both Ms. Thompson and Mr. García made detailed explanations of how the incident de-escalated and eventually ended. Both Ms. Thompson and Mr. García explained that Plaintiff never lost possession of his phone, so there was nothing for them to return to Plaintiff. Trial, Oct. 20, at 9:44; 11:53–11:54 AM. Ms. Thompson and Mr. García also both testified that once the security guard was called, Plaintiff calmed down and apologized to Mr. García and Ms. Thompson. Trial, Oct. 20, at 9:45 AM; 12:02–12:03 PM. Finally, Ms. Thompson and Mr. García reported that the encounter concluded after Mr. García continued the interview and "completed the service" that Plaintiff sought—namely, they discussed Plaintiff's benefits granted by the Board of Veteran's Appeals. Trial, Oct. 20, at 9:47 AM; 12:03 PM. Plaintiff also admits that he talked to Mr. García about the reason why the letter he was given was insufficient. Trial, Oct. 19, at 2:21 PM.

In sum, the evidence shows the following: Mr. García introduced himself and explained the VA policy to Plaintiff. Plaintiff again refused to turn off his cell phone and a confrontation ensued. Mr. García then instructed Ms. Thompson to fetch a security guard, which she did. Once the security guard came to the room, the confrontation de-escalated, and Plaintiff turned off his phone. After passions calmed, Mr. García completed the interview and finished discussing the

benefits issue with Plaintiff. The entire incident on May 29, 2019 occurred approximately within the span of one hour. Nothing that happened after Mr. García arrived to room 126 indicates that Mr. García, Ms. Thompson, or the VA security guard intentionally tried to cause Plaintiff emotional distress. Nor does any of the evidence suggest that a VA employee breached the duty of care to Plaintiff. The VA employees properly explained VA policy, asked for help from security when things appeared to get out of hand, and then provided service to Plaintiff once the dispute had been resolved. In conclusion, Plaintiff failed in his burden to prove that any VA employee committed intentional or negligence infliction of emotional distress on May 29, 2018 under § 1802 of the Puerto Rico Civil Code.

### d. Plaintiff's False Imprisonment Claim with Regard to the May 29, 2018 Incident

Finally, Plaintiff argues he is entitled to judgment for "illegal detention" during the May 29, 2018 incident. ECF No. 4 at 11, ¶¶ 5.4–5.6; ECF No. 25 at 19. The tort of illegal detention is interchangeably called "false imprisonment" under Puerto Rico law. Compare Boschette v. Buck, 914 F. Supp. 769, 774 (D.P.R. 1995) with García Calderón v. Galiñanes Hermanos, 83 P.R.D. 318, 319 n. 1 (1961). To win on a claim of false imprisonment, a plaintiff must show (1) actual detention or restraint of plaintiff's liberty; (2) without his consent; (3) for an appreciable time. Id. Nevertheless, this court does not have jurisdiction under the Federal Tort Claims Act over intentional torts such as false imprisonment. The FTCA "intentional tort exception" specifically provides that "this title shall not apply to-- . . . Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C.A. § 2680(h); Camacho v. United States, 2005 WL 2644959, at *5 (D.P.R. May 24, 2005) (emphasis added). As such,

the court cannot properly exercise jurisdiction over Plaintiff's claim of false imprisonment, and it is hereby dismissed.

Even if the claim Plaintiff brings were not correctly construed as the intentional tort of false imprisonment or any other of the torts barred by 28 U.S.C.A. § 2680(h), the evidence at trial demonstrated that no involuntary detention or restraint of Plaintiff's liberty occurred on May 29, 2018. The important elements here are whether VA employees detained Plaintiff without his consent. The alleged "detention" in question centers on the time Plaintiff spent in interview room 126 at the VA Benefits and Compensation Section in Guaynabo. Plaintiff alleges that he was left alone for an hour by Ms. Thompson, and that he was in interview room 126 for another hour once Ms. Thompson returned with Mr. García. Trial, Oct. 18, at 10:55 AM. As discussed above, the totality of the evidence shows that the entire incident on May 29, 2018 likely occurred in about an hour or slightly more, and that Plaintiff was left alone in room 126 for only a few minutes. Trial, Oct. 19, at 2:21 PM; Trial, Oct. 20, at 10:20 AM; 12:02–12:03 PM; 12:23 PM.

More importantly, the totality of the evidence at trial shows that Plaintiff was not detained or restrained in room 126. First, when Plaintiff was left alone in room 126, the evidence established that had he wanted to leave, he could have done so whenever he wished. In asserting that he was detained, Plaintiff only testified that he suspected that the door was locked but admitted that he never tried the door find out if it was locked. Trial, Oct. 19, at 12:21 PM. Both Ms. Thompson and Mr. García described how a person inside interview room 126 could also push a "green button" located near the door to exit. Trial, Oct. 20, at 9:31–9:32 AM; 12:31 PM. They also clarified that the doors in the interview rooms were equipped with motion detectors that would unlock the door with a loud audible click when someone in the room moved. Trial, Oct. 20, at 9:31–9:32 AM; 12:31 PM. Therefore, Plaintiff could have easily known whether he

38

was locked in room 126 either by pressing the door's green button behind him or by simply moving.

Once outside of room 126, Mr. García described how a pair of double doors in the hallway allowed a person to exit the VA facility by either swiping a magnetic card or by simply pushing them open, at which time a security alarm would sound. Trial, Oct. 20, at 12:36–12:38 PM; Exhibit D. The cross examination of Mr. García insinuated that because the double doors had a magnetic card reader and because opening them would trigger an alarm, Plaintiff was locked in the VA facility. Trial, Oct. 20, at 12:33–12:34 PM. If that were the case, every single veteran in one of the interview rooms accessed through this hallway would have been detained without his or her consent every time they entered the hallway—an obviously erroneous conclusion. Furthermore, the knowledge that the door triggered an alarm would only have been relevant if Plaintiff had actually tried to leave the facility. Plaintiff did not even go so far as to determine whether he was really locked inside room 126, let alone try to leave the hallway. Trial, Oct. 19, at 12:21 PM. If Plaintiff had found he could easily leave the interview room, walk down the hall, and walk out the doors, Plaintiff would have been free of the facility and away from his alleged captors, even if the alarm had sounded. Therefore, at no time was Plaintiff confined, either in room 126 or in the hallway leading to room 126—he could have walked out whenever he wished. Plaintiff failed to carry his burden of proof to show he was physically detained at the VA facility.

In attempting to explain why he felt detained, Plaintiff testified that when Ms. Thompson left him the first time, two unknown men appeared and stared at him while he was in room 126, which caused Plaintiff to feel "annoyed," "depressed," "anxious," and "like as if [he] was detained against [his] will." Trial, Oct. 18, at 10:37–10:38 AM. There was no further testimony

about these men, and Plaintiff offered no evidence as to their identities or status as VA employees. However, Ms. Thompson testified plainly that she did not ask anyone to stay or to watch over Plaintiff when she left. Trial, Oct. 20, at 9:37–9:38 AM. It makes sense that Ms. Thompson would not have asked anyone to watch Plaintiff if she was only gone for a few minutes. Vague testimony about the presence of some unknown individuals peering through a window during the few minutes Plaintiff was left alone in room 126 fails to carry the burden of proof—or to even provide convincing evidence—that plaintiff was somehow confined in the interview room.

Lastly, when Ms. Thompson and Mr. García returned, Plaintiff at no point asked to leave, despite alleging that he felt he was "detained against [his] will." Trial, Oct. 18, at 10:37–10:38 AM. Instead, the testimony showed that Plaintiff continued to discuss the VA regulations with Mr. García. Trial, Oct. 20, at 12:02 PM; Trial, Oct. 19, at 2:20 PM. At that point, there were no mysterious men watching Plaintiff, nor had security been called. Only later in the discussion, when the encounter had escalated, did Mr. García ask Ms. Thompson to seek help from a security guard. Trial, Oct. 20, at 11:56–11:57 AM. The evidence at trial showed that the security guard was not called to keep Plaintiff from leaving. Instead, the guard was called because Mr. García feared that the confrontation in the interview room was escalating, and a security guard was needed to protect everyone's safety. Trial, Oct. 20, at 11:56–11:57 AM. When the guard arrived, he did not handcuff, physically hold, or otherwise restrain Plaintiff—nor did anyone else. Trial, Oct. 19, at 12:19 PM; Trial, Oct. 20, at 12:07 PM. At most, the security guard simply reiterated the VA policy on cell phone recordings and left when Mr. García continued the interview with Plaintiff. Trial, Oct. 20, at 11:59 AM–12:00 PM. Inconsistent with a person who

wishes to leave, Plaintiff thereafter continued to discuss his case with Mr. García, rather than asking to be released or trying to leave. Trial, Oct. 20, at 9:47 AM; 12:03 PM.

In sum, there was nothing that prevented Plaintiff from leaving the interview room or VA facility at any time. He was therefore not detained or restrained. Moreover, nothing that was done or said in room 126 indicated that Plaintiff did not consent to be in the room during the duration of the incident. Therefore, on the merits, Plaintiff's claim of false imprisonment also must fail.

## IV.   CONCLUSION

Regarding Defendant's rule 52(c) motion, Plaintiff failed to exhaust his administrative remedies concerning his claim of negligent infliction of emotional distress for the August 5, 2016 incident, failed to preserve his claim of violation of privacy for the May 29, 2018 incident, and failed to prove an essential element for all three claims of common law intentional infliction of emotional distress. On the above claims, Defendant's rule 52(c) motion is **GRANTED**. Therefore, the claim of negligent infliction of emotional distress for the August 5, 2016 incident, the violation of privacy claim stemming from the May 29, 2018 incident, and all three claims of common law intentional infliction of emotional distress for the August 5, 2016, January 22, 2018, and May 29, 2018 incidents are hereby **DISMISSED WITH PREJUDICE**.

Turning to the merits of the evidence at trial, Plaintiff failed to prove by a preponderance of the evidence that any VA employee either on August 5, 2016, January 22, 2018, or May 29, 2018 intentionally or negligently inflicted emotional distress on Plaintiff in violation of § 1802 of the Puerto Rico Civil Code. This court cannot exercise jurisdiction over the tort of false imprisonment, but even if it could, the evidence at trial clearly establishes that Plaintiff was not falsely imprisoned. Therefore, Plaintiff's claim of false imprisonment is also **DISMISSED**.

41

While the court wholeheartedly hopes that employees of the Veterans Administration faithfully execute their work with the utmost care and respect for our veterans, impoliteness does not rise to the level of tort. For the foregoing reasons, the court finds Defendant **NOT LIABLE** with respect to all of Plaintiff's claims under the Federal Tort Claims Act.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 3rd day of December, 2021.

s/Marcos E. López
U.S. Magistrate Judge